*In re* ESTATE OF ACSA JOHNSON, a Disabled Adult (Mary E. Jones *et al.*, Petitioners-Appellants and Cross-Appellees, v. Acsa Johnson, Respondent-Appellee and Cross-Appellant).

Fifth District   No. 5—89—0724

Opinion filed October 1, 1991.

Stephanie Robbins, of Edwardsville, for appellants.

Barbara L. Sherer, of Lucco, Brown & Mudge Law Offices, of Edwardsville, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Petitioners, Mary E. Jones and Patricia Penelton, appeal from an order of the circuit court of Madison County removing Patricia Penelton as limited guardian of respondent, Acsa Johnson, and ap-

pointing instead the office of the State Guardian. Petitioners also appeal from an order of the circuit court limiting recovery of attorney fees from respondent's estate to $186.75. Additionally, respondent has cross-appealed the order of the circuit court ordering respondent's estate to pay court costs, petitioners' attorney fees in the amount of $186.75, and the guardian *ad litem* fees. The issues we are asked to address are: (1) whether the trial court erred in appointing the office of the State Guardian, and (2) whether the trial court erred in ordering respondent's estate to pay court costs, attorney fees in the amount of $186.75, and guardian *ad litem* fees. We affirm as modified.

Respondent, the subject of the petition for guardianship, was born in 1902 and has spent most of his adult life in Madison County. He was married, but has been widowed for approximately 20 years. No children were born of the marriage. Petitioner, Mary Jones, is respondent's sister. The other petitioner, Patricia Penelton, who sought to be named respondent's guardian, is respondent's niece and a daughter of Mary Jones. Respondent's education is apparently limited to early grade school. He worked as a laborer at Laclede Steel for a number of years and currently receives a pension and continued medical coverage from the company. Over his lifetime, respondent has accumulated an estate valued at approximately $250,000, consisting of cash deposits and two parcels of real estate. Respondent has lived a miserly existence in order to acquire such an estate. He taught his nieces and nephews to call him "Uncle Pinch Penny." Respondent takes great pride in the value of his estate.

Late in 1986, respondent's health began to fail until he was near death. He was finally hospitalized for congestive heart failure in December 1986. Respondent's health improved somewhat, and he was able to leave the hospital in January 1987. Respondent still required 24-hour-a-day care, and his family decided that he should be cared for in his own home, as he had always expressed a desire not to be placed in a nursing home. Geraldine Mitchell Freeman, Patricia Penelton's sister and a registered nurse, took a leave of absence from her job in Chicago to come down to Edwardsville to care for respondent. Her two children also came with her to assist in the care. Freeman remained on leave of absence from her job from January 5, 1987, through April 1, 1987. Freeman and her children received compensation for their care of respondent out of respondent's funds: Freeman received $57,000 in 1987 and $12,850 in 1988, her daughter received $24,100 in 1987 and $9,000 in 1988, and her son received $6,600 for 20 days of service in 1987. The expenditures were made by Mary

Jones pursuant to a power of attorney she received on January 13, 1987. In addition to expenditures for respondent's health care, several thousands of dollars were spent refurbishing respondent's home in 1987, because it had fallen into a state of unhealthy disrepair. Apparently, this unhealthy situation had existed for several years prior to respondent's hospitalization. A total of $147,000 was expended through Mary Jones' power of attorney. While respondent had medical coverage through Laclede Steel, petitioners made almost no effort to have respondent's medical bills reimbursed by his insurance.

Respondent learned in July 1988 how much had been spent by petitioners. Respondent believes that petitioners and Freeman "took his money." He no longer wants petitioners or Freeman to take care of him or his affairs. Instead, respondent would like to continue to be cared for by his niece and nephew, John and Judy Nelson. The Nelsons began living with respondent in the summer of 1988. There was testimony that the Nelsons moved into respondent's house and changed the locks and have prohibited petitioners, Freeman, and her children from seeing respondent. In response to such action, petitioners filed their petition requesting to be named guardians of respondent on July 14, 1988. Petitioners' main complaint is that the Nelsons are interfering with their relationship with respondent. Because of the tension within the family, a guardian *ad litem* was appointed by the court. After consultation with physicians who evaluated respondent, and after meeting with both the Nelsons and petitioners, the guardian *ad litem* recommended that it would not be appropriate either to adjudicate respondent as mentally unable to take care of his affairs or to appoint petitioners as guardians. If the court determined that a guardian was necessary, the guardian *ad litem* recommended that a person independent of the family be appointed. The guardian *ad litem* did recommend a limited guardianship to assist respondent in financial matters.

On March 30 and 31, 1989, the petition for guardianship was heard. At this hearing no effort was made to have Mary Jones appointed guardian because of her advanced age. An order was entered on April 3, 1989, and amended on April 19, 1989. The order, among other things, found that the Nelsons may have "used respondent's preoccupation with money to foster in him an antipathy toward, and alienation from, his immediate family and those family members who have been closest to him throughout his lifetime." It also appointed Patricia Penelton as guardian of the person of respondent, but reserved the issue of who should be appointed guardian of the estate, and ordered a complete psychological evaluation of respondent. The

matter was continued for further hearing regarding the appointment of a guardian of the estate and the results of the evaluation. Respondent then filed a petition to remove Patricia Penelton as guardian and/or substitute the Nelsons as coguardians.

The court entered various orders after a hearing on September 11, 1989. The court ordered attorney fees of $186.75 and costs of $193.86 to be paid out of respondent's estate to petitioners. The additional $2,334.71 requested by petitioners' attorney was denied. Patricia Penelton was removed as limited guardian. The Bank of Edwardsville was appointed limited guardian of respondent's estate for the purpose of ensuring that respondent's money is directed in the manner which respondent desires. The trial court specifically found that respondent "is capable of making his own decisions concerning the disposition of his money and property." The office of the State Guardian was appointed to oversee that respondent remained properly fed, clothed, and sheltered.

The first issue we are asked to address is whether the trial court erred in appointing the office of the State Guardian. Petitioners contend that the office of the State Guardian should not have been appointed in this case because another suitable person, namely, Patricia Penelton, was available and was willing to accept the guardianship appointment. Petitioners argue that the office of the State Guardian can only be appointed if a family member is not available to assume the duties. Respondent replies that the trial court was within the bounds of reasonable discretion in refusing to appoint Patricia Penelton as respondent's guardian and instead appointing the State Guardian as the limited guardian over respondent's person. We agree.

A limited guardian may be appointed over either respondent's person or estate, or both, if the respondent is adjudged to be disabled and to lack some, but not all, capacity. (Ill. Rev. Stat. 1987, ch. 110½, par. 11a—10(c).) Selection of a limited guardian is within the trial court's discretion, which must give due consideration to the preference of the disabled person. (Ill. Rev. Stat. 1987, ch. 110½, par. 11a—12(d).) The primary consideration in the selection of a guardian is the best interest and well-being of the disabled person. (*In re Estate of Bennett* (1984), 122 Ill. App. 3d 756, 762, 461 N.E.2d 667, 671.) In selecting a guardian, the court may consider such factors as past actions and conduct of proposed guardians, business experience, ages, and family situations. (*In re Estate of Robertson* (1986), 144 Ill. App. 3d 701, 712, 494 N.E.2d 562, 570.) Our General Assembly has provided that "[t]he State Guardian shall not be appointed if another

suitable person is available and willing to accept the guardianship appointment." Ill. Rev. Stat. 1987, ch. 91½, par. 731.

■ In the instant case, there was ample evidence to support the trial court's decision to appoint the State Guardian. First, evidence was presented to indicate a feud between two factions of respondent's family concerning the care of respondent. The court was correct to take the existing rift between respondent's family into consideration. Second, the independent guardian *ad litem* concluded that petitioners would not be appropriate guardians in this situation and that if a guardian was appointed, a person independent of the family should be appointed. Third, respondent himself voiced his resentment of petitioners and his strong preference that they not be appointed his guardian. Based upon these circumstances, we cannot say that the trial court abused its discretion in finding petitioners unsuitable to be respondent's guardian and instead appointing the office of the State Guardian. We find no conflict between the appointment of the State Guardian and section 31 of the Guardianship and Advocacy Act (Ill. Rev. Stat. 1987, ch. 91½, par. 731).

The other issue we are asked to consider is whether the trial court erred in ordering respondent's estate to pay court costs, attorney fees in the amount of $186.75, and guardian *ad litem* fees. Petitioners contend they were entitled to recover the full amount of $2,521.46 asked for in the petition. This amount was based upon a rate of $75 per hour for 33.62 hours of work. Petitioners contend that the award of $186.75 is unreasonable and arbitrary. On the other hand, respondent has cross-appealed this issue, arguing that petitioners were entitled to recover nothing.

Section 27—2 of the Probate Act of 1975 provides that "[t]he attorney for a representative is entitled to reasonable compensation for his services." (Ill. Rev. Stat. 1987, ch. 110½, par. 27—2.) The definition section of the Probate Act states that a " 'Representative' includes executor, administrator, administrator to collect, guardian and temporary guardian." (Ill. Rev. Stat. 1987, ch. 110½, par. 1—2.15.) Generally, an attorney for a person seeking a conservatorship is entitled to attorney fees whether the petition is successful or not. *In re Estate of Roselli* (1979), 70 Ill. App. 3d 116, 123, 388 N.E.2d 87, 92, citing 41 Am. Jur. 2d *Incompetent Person* § 102 (1968).

■ In the instant case, Patricia Penelton did hold a conservatorship position, as she was appointed limited guardian on August 2, 1989. After this, her attorney filed a verified petition seeking attorney fees. At no time did respondent object to the verified petition. Ultimately, Patricia Penelton was removed as limited guardian and the

State Guardian took over those duties. However, petitioners were at least somewhat successful in that the trial court determined respondent did need some assistance in managing his affairs and, therefore, appointed the Bank of Edwardsville as guardian of respondent's estate and also appointed the State Guardian as limited guardian over respondent's person. For the purpose of collecting attorney fees, petitioners can be considered "representatives" contrary to respondent's contention that they cannot. We find that the petition for attorney fees should have been allowed in full.

While the trial court has broad discretion in determining the "reasonable compensation" to be allowed an attorney, its award will be altered where the determination is an abuse of discretion. (*In re Estate of Enos* (1979), 69 Ill. App. 3d 129, 131-32, 386 N.E.2d 1147, 1149.) In the instant case, no one has ever argued that the amount sought for petitioners' attorney fees was unreasonable. In light of the circumstances surrounding this case, we believe that the sum of $2,521.46 is reasonable and that the fees allowed by the trial court were inadequate. We can discern no reason for an award of $186.75, and, therefore, we find that the trial court should have allowed the full amount requested. Applying this same reasoning, we find that the trial court did not abuse its discretion either in ordering $193.86 to be paid out of the estate of respondent to the attorney for petitioners to cover costs or in ordering the guardian *ad litem* fees to be paid out of respondent's estate.

Finally, respondent contends that to allow petitioners to recover fees and costs in the instant case is wrong as a matter of policy because it rewards family members who were motivated by greed rather than by respondent's well-being. However, we cannot say from the record that the petition was brought in bad faith. Petitioners had been on good terms with respondent for a number of years and had helped to nurse him back to good health from what seemed to be a certain death. While there is an argument that the petition was brought in bad faith, there is just as strong an argument that in actuality petitioners delayed too long in filing this petition, which allowed respondent the opportunity to be manipulated by the Nelsons. The trial court, which is in a better position to judge these matters, specifically found that the Nelsons may have "used respondent's preoccupation with money to foster in him an antipathy toward, and alienation from, his immediate family and those family members who have been closest to him throughout his lifetime."

For the foregoing reasons and pursuant to Supreme Court Rule 366(a)(5) (134 Ill. 2d R. 366(a)(5)), we hereby modify in part the order

of the circuit court of Madison County by increasing the award of attorney fees to $2,521.46 and entering judgment thereon; the judgment is otherwise affirmed.

Affirmed as modified; judgment entered.

LEWIS and CHAPMAN, JJ., concur.